IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

---

**No. 25-2903**

---

**FEDERAL TRADE COMMISSION, et al.,**

**Appellant,**

**v.**

**AMERICAN FUTURE SYSTEMS, INC., et al.,**

**Appellees.**

---

# BRIEF FOR APPELLEE COMMONWEALTH OF PENNSYLVANIA

---

APPEAL FROM THE JUDGMENT OF THE UNITED STATES
DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA
ENTERED JULY 30, 2025

DAVID W. SUNDAY, JR.
*Attorney General*

BY: KILEY M. VERBANAC
*Deputy Attorney General*

DANIEL B. MULLEN
*Chief Deputy Attorney General*
*Chief, Appellate Litigation Section*

Office of Attorney General
1251 Waterfront Place
Mezzanine Level
Pittsburgh, PA 15222
Phone: (412) 841-5713
FAX: (717) 772-4526

DATE: May 13, 2026

## TABLE OF CONTENTS

**Page**

INTRODUCTION .......... 1

STATEMENT OF ISSUES .......... 2

STATEMENT OF THE CASE .......... 3

STATEMENT OF RELATED CASES .......... 8

SUMMARY OF THE ARGUMENT .......... 9

ARGUMENT .......... 11

I. THE FTC'S POSITION WAS SUBSTANTIALLY JUSTIFIED IN LAW AND FACT, MAKING AN AWARD OF FEES INAPPROPRIATE. .......... 11

A. The FTC's Position was Reasonably Based in Fact and Supported by Ample Evidence at Trial. .......... 12

*i. AFS's Scripts, According to its Employees, Could be Misleading to Consumers.* .......... 13

*ii. Testimony of Consumers who were Actually Deceived by the Sales Script Further Evidence the FTC's Reasonable Position.* .......... 19

*iii. Thousands of Consumer Complaints Submitted at Trial Confirmed that Consumers were Misled by the Script.* .......... 21

B. The FTC's Legal Position Aligned with Third Circuit Precedent. .......... 22

II. THE DISTRICT COURT CONFLATED ITS MERITS DETERMINATION WITH THE EAJA'S SUBSTANTIAL JUSTIFICATION INQUIRY. .......... 25

CONCLUSION .......... 27

CERTIFICATE OF COUNSEL .......... 28

CERTIFICATE OF SERVICE .......... 29

# TABLE OF AUTHORITIES

**Page**

**Cases**

*American Home Products Corp. v. FTC*, 695 F.2d 681 (3d Cir. 1982) 10, 12, 19, 24

*Beneficial Corp. v. FTC*, 542 F.2d 611 (3d Cir. 1976).................................. passim

*Citizens Council of Delaware Cnty. v. Brinegar*, 741 F.2d 584 (3d Cir. 1984) 11, 12

*Cohen v. Bowen*, 837 F.2d 582 (2d Cir. 1988) .......................................................26

*Comm'r v. Jean*, 496 U.S. 154 (1990) ....................................................................12

*Cox v. Horn*, 757 F.3d 113 (3d Cir. 2014)................................................................11

*Exposition Press, Inc. v. FTC*, 295 F.2d 869 (2d Cir. 1961) ..................................14

*F.T.C. v. E.M.A. Nationwide, Inc.*, 767 F.3d 611 (6th Cir. 2014) ..........................14

*F.T.C. v. Magazine Solutions, LLC*, 432 Fed.Appx. 155 (3d Cir. 2011)................22

*FTC v. Fleetcor Techs., Inc.*, 620 F. Supp. 3d 1268 (N.D. Ga. 2022).....................16

*FTC v. IAB Mktg. Assoc., L.P.*, 746 F.3d 1228 (11th Cir. 2014)............................15

*FTC v. Johnson*, 96 F.Supp. 3d 1110 (D. Nev. 2015) ............................................15

*FTC v. NHS Sys., Inc.*, 936 F. Supp. 2d 520 (E.D. Pa 2013)..................................12

*FTC v. Publishers Bus. Servs., Inc.*, 821 F. Supp. 2d 1205 (D. Nev. 2010) ..........15

*Hadden v. Bowen*, 851 F.2d 1266 (10th Cir. 1988)................................................26

*Hanover Potato Prods., Inc v. Shalala*, 989 F.2d 123 (3rd Cir. 1993)...................12

*Johnson v. Gonzales*, 416 F.3d 205 (3d Cir. 2005) ....................11

*Kiareldeen v. Ashcroft*, 273 F.3d 542 (3d Cir. 2001) ....................25

*Morgan v. Perry*, 142 F.3d 670 (3d Cir. 1998).................... 9, 11, 25

*Pierce v. Underwood*, 487 U.S. 552, 560 (1988) .................... 11, 25

*Regina Corp. v. F.T.C.*, 322 F.2d 765 (3d Cir. 1963).................... 12, 19

*Sandoz Pharmaceuticals Corp. v. Richardson-Vicks, Inc.*, 902 F.2d 222 (3d Cir. 1990) ....................15

*State ex rel. Miller v. Vertrue, Inc.*, 834 N.W.2d 12 (Iowa 2013)....................15

*Taylor v. Heckler*, 835 F.2d 1037 (3d Cir. 1987) ....................26

**Statutes**

15 U.S.C. § 45(a) ....................6

15 U.S.C. § 55(a)(1)....................12

28 U.S.C. § 2412.................... 1, 6, 25

39 U.S.C. § 3009....................6

73 P.S. § 201-3....................6

## INTRODUCTION

The Federal Trade Commission (FTC) appeals from an order assessing attorneys' fees, expenses, and costs against it under the Equal Access to Justice Act, 28 U.S.C. § 2412. The district court awarded fees, expenses, and costs based on its conclusion that the FTC lacked a substantial justification for bringing suit against American Future Systems, Inc.

The Commonwealth of Pennsylvania was a co-plaintiff below and asserted separate state law claims against American Future Systems related to its telemarketing practices. Although expenses, fees, and costs under Section 2412 may be assessed against the United States, its agencies, and its officials only, and while the Commonwealth is technically an appellee in this case, the Commonwealth supports the FTC's position on appeal. For the reasons explained below, the district court erred in finding that the FTC lacked substantial justification for bringing suit.

## STATEMENT OF ISSUES

I. Did the Federal Trade Commission (FTC) reasonably believe that Appellee, American Future Systems, Inc., engaged in deceptive business practices in violation of Section 5(a) of the Federal Trade Commission Act?

II. Did the district court improperly conflate its determination on the merits with its determination that the FTC's position lacked substantial justification?

## STATEMENT OF THE CASE

This appeal concerns Appellee, American Future Systems, Inc.'s, sale of newsletters and publications through its now-defunct business venture conducted under the names Progressive Business Publications, Progressive Business Publications, Inc., the Center for Education and Employment Law, and Progressive Business Publications of New Jersey, Inc. (collectively referred to as "AFS"). JA12. At the center of this dispute are the standardized scripts AFS required its telemarketers to use when selling automatically renewing yearly subscription services. Those scripts presented what a reasonable listener would understand as a preliminary, no-obligation opportunity to review AFS's material before making a purchase decision.

AFS's telemarketing operation followed a uniform structure. Telemarketers "cold-called" businesses nationwide and were trained to reach an employee at the business with the authority to make purchases on behalf of their employer. JA15-17. When someone without this authority answered the phone, telemarketers used a designated "gatekeeper" or "secretary" script designed to hide the true nature of the call. JA17.

The secretary scripts were far from honest. In one version, telemarketers were expressly instructed to deny they were making a sales call when asked. *See e.g.*, JA365:1-6 (the trained response to inquiries about whether it was a sales call was to

say "no, we are not selling something, this is not a sales call."). If a telemarketer succeeded in reaching an executive—either by bypassing the gatekeeper or by initial contact—the telemarketer shifted to a separate "sales" or "executive" script.[1] JA21. This script instructed telemarketers to obscure AFS's identity by presenting themselves as calling from one of approximately thirty different entities, only some of which were names legally registered in Pennsylvania. ECF 339-3, 8-9.

The sales script was structured to frame AFS's offer as a free preview rather than an immediate purchase with a right of cancellation. At the outset, telemarketers told potential customers that they would "send out a couple copies for [the employee] to look at," and that they would "call [the employee] back to see how [they] liked" the samples. JA21. They also offered "a quick preview right now," or an email link they could "look at later on." JA21. Regardless of the customer's response, and even if the customer said they would prefer to review the materials later, telemarketers proceeded to the next part of the script in an attempt to close a sale. JA21-22.

The next paragraph of the script, denoted the "offer" paragraph, reinforced the impression that customers were not making an immediate purchase decision. Telemarketers represented that AFS would send copies "at no risk, so [the employee] can get some feedback," and reiterated that they would "call [the employee] back"

[1] While there were numerous versions of the secretary script, the sales script was nearly the same across all publications and newsletters. JA17-18.

after a review period. JA22. The offer paragraph concluded with a statement insinuating a purchasing decision would come later, if at all: "Our hope is that you'll become a paid subscriber, but we know we'll have to prove ourselves first." JA22. Nowhere in the offer paragraph do telemarketers discuss price or other material terms of their offer. JA22.

If telemarketers made it through the offer paragraph, they moved to the final portion of the script denoted as the "disclosure" paragraph. JA22. It began with another insinuation that no final deal is being made, telling customers that an email would arrive shortly "with our whole offer in writing." JA22. Notably lacking from the disclosure paragraph is a clarification that by the time the email arrived in the customer's inbox, the deal was already closed. JA22. Only after this statement did telemarketers review the finer details of the subscription service, including price, the number of newsletters provided, and how to cancel the subscription. JA22. However, essential terms, such as consumers' ability to cancel, were deemphasized (ECF 432 at 50:1-7) and telemarketers read the script quickly to give customers "less opportunity" to object (JA351:4-7).

Based on the foregoing business practices, the FTC filed a complaint against AFS for deceptive business practices. JA233. The complaint was later amended to add the Commonwealth of Pennsylvania as a co-plaintiff. JA232. Together, the Commonwealth and FTC asserted six claims (three federal, and three state) for

deceptive trade practices against American Future Systems, Inc., Progressive Business Publications of New Jersey, Inc., and sole owner and founder, Edward M. Satell.[2] JA4, at n. 2.

Following a fifteen-day non-jury trial, the district court entered judgment in favor of AFS on all counts. JA54-55. The district court concluded that the FTC failed to prove, by a preponderance of the evidence, that AFS's scripts had the capacity to mislead consumers in violation of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45(a). JA44. AFS then moved for attorneys' fees, expenses, and costs from the FTC under the Equal Access to Justice Act ("EAJA"), 28 U.S.C. § 2412.[3] JA230.

The district court granted AFS's motion and ordered the FTC to pay $3,046,291.94. JA230-JA231. In doing so, it found that the FTC lacked a substantial justification in either fact or law for its litigation position. *See generally*, JA56-JA144. According to the district court, the FTC lacked a reasonable belief in fact because it adopted a biased view of the scripts, and its interpretation was not

[2] In the complaint, the FTC alleged two counts for violations of Section 5(a) of the Federal Trade Commission Act, 15 U.S.C. § 45(a) and one count related to the sale of unauthorized merchandise under 39 U.S.C. § 3009. The Commonwealth alleged three counts against AFS for deceptive misrepresentations, failure to disclose material terms, and sending/ billing for unordered merchandise in violation of 73 P.S. § 201-3. JA5-6.

[3] The EAJA only permits AFS to collect attorney's fees from an agency of the United States. 15 U.S.C. § 2412(a)(1). Accordingly, the Commonwealth of Pennsylvania is not liable for attorney's fees under the EAJA.

adequately supported by evidence on the record. JA101-JA102. Moreover, the court determined that the FTC lacked a legally reasonable position in part because it diverted from binding Third Circuit precedent requiring advertisements to be viewed as a whole. JA126-JA127.

This appeal followed.

## STATEMENT OF RELATED CASES

This case has not previously been before this Court.

## SUMMARY OF THE ARGUMENT

"The EAJA is not a 'loser pays' statute." *Morgan v. Perry*, 142 F.3d 670, 685 (3d Cir. 1998). Yet, that is effectively the rule the district court applied when it ordered the FTC to pay more than three million dollars in attorney's fees and costs to AFS. In doing so, the district court incorrectly conflated its prior finding that the FTC did not meet its burden at trial with the FTC lacking a substantial justification in either law or fact for bringing a case in the first place. That is not the standard for awarding attorney's fees under the EAJA. A federal agency needs to only take a reasonable position for an award of fees to be inappropriate. The FTC satisfied that burden here.

The FTC's theory was simple: AFS's scripts had the capacity to mislead consumers into believing they were going to receive a free trial to a subscription service, when in reality, AFS enrolled them in paid, automatically renewing subscription that required affirmative action to cancel. The trial record amply supports the reasonableness of this position. First, the scripts themselves lend themselves to a misleading interpretation. If an AFS telemarketer had not already lied to a secretary about whether they are selling anything, the sales script framed further discussions as an offer for a no risk preview and repeatedly signaled a purchasing decision would occur later.

Testimony from prior customers and employees of AFS further confirmed the reasonableness of the FTC's position. Prior customers testified that they were actually misled by AFS's sales offer and employees recognized the script's misleading nature. This position was further supported by the thousands of consumer complaints which reflected the same misunderstanding of sales script.

Additionally, the FTC adhered to Third Circuit precedent. Two controlling cases in this Circuit, *Beneficial Corp. v. FTC*, 542 F.2d 611 (3d Cir. 1976) and *American Home Products Corp. v. FTC*, 695 F.2d 681 (3d Cir. 1982), instruct that allegedly misleading advertisements must be viewed in their entirety. The FTC did exactly that. In fact, the FTC went one step beyond what *Beneficial Corp.* and *American Home* require in terms of evidence, and elicited consumer testimony of actual customer deception.

The district court ultimately rejected the FTC's claims after a non-jury trial. As factfinder, the court was certainly entitled to weigh the evidence and conclude that the FTC had not carried its burden on the merits. But that conclusion does not render the FTC's position unreasonable. This Court has made clear that the substantial justification inquiry is "distinct" from the merits, and a loss on the merits does not transform a reasonable position into an unreasonable one. *Morgan*, 142 F.3d at 685. The district court erred by collapsing these two inquiries, and thus, its award of attorney's fees cannot stand.

## ARGUMENT

*Standard of Review*: A "district court's determination of substantial justification in a suit under the EAJA is reviewed for abuse of discretion." *Morgan v. Perry*, 142 F.3d 670, 682 (3d Cir. 1998) (citing *Pierce v. Underwood*, 487 U.S. 552, 560 (1988)). "A district court abuses its discretion when it bases its decision upon a clearly erroneous finding of fact, an erroneous conclusion of law, or an improper application of law to fact." *Cox v. Horn*, 757 F.3d 113, 118 (3d Cir. 2014).

### I. THE FTC'S POSITION WAS SUBSTANTIALLY JUSTIFIED IN LAW AND FACT, MAKING AN AWARD OF FEES INAPPROPRIATE.

A federal agency is not liable for attorney's fees under the EAJA if its position was substantially justified in both fact and law. *Pierce*, 487 U.S. at 565 (1988). Substantial justification in this context is a test of reasonableness. *Johnson v. Gonzales*, 416 F.3d 205, 210 (3d Cir. 2005). It does not require the government to be "justified to a high degree" (*Pierce*, 487 U.S. at 565), nor does it mean that the government must prevail at trial to avoid the imposition of attorney's fees (*Morgan*, 142 F.3d at 685). Rather, the standard reflects the EAJA's purpose: "to remedy the imbalance of means that has been thought to deter impecunious litigants from seeking review of, or defending against, *unreasonable* governmental action." *Citizens Council of Delaware Cnty. v. Brinegar*, 741 F.2d 584, 589 (3d Cir. 1984) (emphasis added). To that end, if government action is "justified to a degree that

could satisfy a reasonable person," then an award of attorney's fees is not appropriate. *Id*.

A substantial justification analysis requires a review of the government's position "as a whole, rather than as atomized line items." *Comm'r v. Jean*, 496 U.S. 154, 161 (1990); *Hanover Potato Prods., Inc v. Shalala*, 989 F.2d 123, 131 (3rd Cir. 1993). Each individual position the government took during litigation need not independently satisfy the substantial justification analysis, only its overall position must do so. *Hanover*, 989 F.2d at 131.

### A. The FTC's Position was Reasonably Based in Fact and Supported by Ample Evidence at Trial.

"'False advertisement,' as defined by 15 U.S.C. § 55(a)(1), is a broadly inclusive term" which includes misleading advertisements. *American Home Products Corp. v. FTC*, 695 F.2d 681, 683-84 (3d Cir. 1982). To establish a violation of Section 5 of the FTCA for a misleading advertisement, the FTC must establish a (1) representation that (2) is likely to mislead consumers acting reasonably under the circumstances, and (3) the representation was material. *FTC v. NHS Sys., Inc.*, 936 F. Supp. 2d 520, 531 (E.D. Pa 2013). The second element does not require the FTC to show "actual deception," but only "the likelihood of deception or the capacity to deceive." *Id*. (quoting *FTC v. Magazine Sols., LLC*, 2010 WL 1009442, at *11 (W.D. Pa. 2015)); *American Home*, 695 F.2d at 687; *Regina Corp. v. F.T.C.*, 322 F.2d 765, 768 (3d Cir. 1963). However, "evidence that some customers actually

misunderstood the thrust of the message is significant support for the finding of a tendency to mislead." *Beneficial Corp. v. FTC*, 542 F.2d 611, 617 (3d Cir. 1976).

Throughout this case, the FTC maintained a reasonable factual basis for its position that AFS's scripts had the capacity to mislead consumers. The FTC argued that AFS's scripts, specifically its sales script, falsely lulled customers into believing that they signed up for a free trial when they signed up for a subscription with a right of cancellation. And at trial, the FTC supported that theory with testimony from consumers who were misled by the scripts, testimony from former AFS employees, and thousands of consumer complaints.

*i. AFS's Scripts, According to its Employees, Could be Misleading to Consumers.*

The secretary scripts are misleading on their face. Often the first contact AFS had with prospective customers, these scripts coached telemarketers to obscure the true identity of where they were calling from,[4] obscure the true nature of the call,[5]

---

[4] AFS's secretary script marketing their "Legal Updates for Teachers" publication service instructed telemarketers to respond with their own name rather than the name of their employer. ECF 339-3, at 6. For other secretary scripts, telemarketers were instructed to say they were calling from "Center for Employment Law," "Facilities Manager's Alert," "Foundation & Corporate Funding Advantage," "School Safety & Security Alert," "Progressive Business," or "PBP," none of which are registered business entities or fictitious names in Pennsylvania. ECF 339-3, 5-6.

[5] If a secretary asked if a telemarketer was selling something, telemarketers evaded the question. For example, some scripts outlined responses such as "I need to discuss some quality issues," "I have a couple questions about building (continued….)

and, in some instances, outwardly lie to potential customers that they were not selling anything when that was precisely their goal.[6] *See, e.g.*, *F.T.C. v. E.M.A. Nationwide, Inc.*, 767 F.3d 611, 632 (6th Cir. 2014); *Exposition Press, Inc. v. FTC*, 295 F.2d 869, 873 (2d Cir. 1961) (an advertiser violates the FTCA if "the first contact is secured by deception.").

The sales script, while more subtle, was no less misleading. Read as a whole, it reasonably conveyed that the consumer was being offered a free trial, not enrolling in a paid subscription. The script repeatedly emphasized a deferral of any purchasing decision:

- "We'll call you back and see how you like it."
- "[O]ur hope is that you'll become a paid subscriber, but we know we'll have to prove ourselves first"
- "We'll send out _ copies … at no risk."
- "[S]ee if it is a good fit with what you are already doing"

JA21-22.

---

maintenance issues," or "I have some questions about billing" in response. ECF 339-3 at 6. These responses do not accurately apprise customers that telemarketers are making sales calls.

[6] In some scripts, if a secretary were to ask "are you selling something," the coached response was "no." JA54, at n. 84. Additionally, telemarketers were trained to deny making a sales call. JA365:1-5.

These statements signaled that no commitment was made. Even the disclosure paragraph reinforced that impression by stating that a forthcoming email would soon arrive "with our whole *offer* in writing." JA22 (emphasis added). It is far from unreasonable for the FTC to assert that a consumer may interpret this language to mean that the offer remained open, not already accepted. *See Sandoz Pharmaceuticals Corp. v. Richardson-Vicks, Inc.*, 902 F.2d 222, 228 (3d Cir. 1990) ("'Advertising capable of being interpreted in a misleading way should be construed against the advertiser.'") (quoting *Resort Car Rental Systems, Inc. v. F.T.C.*, 518 F.2d 962, 964 (9th Cir. 1975)). *See also, See FTC v. IAB Mktg. Assoc., L.P.*, 746 F.3d 1228, 1233 (11th Cir. 2014) (finding that "disclosures sent to consumers after their purchases [cannot] cure the misrepresentations occurring during the initial sales").

AFS's telemarketers also failed to clarify that "no risk" did not mean "free."[7] If a customer asked whether the newsletters were free, AFS's telemarketers were trained to repeat that the materials were "no risk" without explaining that the two

[7] Similar language in advertisements has been found to be misleading in other courts. *See State ex rel. Miller v. Vertrue, Inc.*, 834 N.W.2d 12, 35-36 (Iowa 2013) (finding that a script advertising a "risk-free 30-day trial membership" was misleading because it "effectively conveyed the impression the consumer was not forming a binding agreement" and "did not reveal to consumers that they were being confronted with a purchase decision."). *See also FTC v. Johnson*, 96 F.Supp. 3d 1110 (D. Nev. 2015) (advertising a "risk-free" membership); *FTC v. Publishers Bus. Servs., Inc.*, 821 F. Supp. 2d 1205, 1224-25 (D. Nev. 2010).

terms were not synonymous. JA367:1-4. Again, it is reasonable for the FTC to assert that this language could mislead a potential customer.

Finally, although the sales script included a late-stage reference to cancellation that was buried at the end of the call (JA22-23), that isolated disclosure does not necessarily cure the overall message of the script, which is that a purchase decision would be made later. *See, e.g.*, *Beneficial Corp.*, 542 F.2d at 616 (misleading advertisements "must be judged by viewing it as a whole, without emphasizing isolated words or phrases apart from their context."). *See also*, *FTC v. Fleetcor Techs., Inc.*, 620 F. Supp. 3d 1268, 1298–99 (N.D. Ga. 2022) (finding that later disclosures "cannot cure" prior misleading information).

Two prior AFS employees, Amy Luchette and Kelly Strosnider, provided testimony confirming what, in their view, was the misleading nature of AFS's sales tactics. Ms. Luchette, who worked as a sales representative, testified that she thought the sales script was written so that consumers did not "know exactly what they were saying no to because there's a lot of information coming at them quickly." JA358:21-25. She further testified: "I don't feel that what I did was right. I feel that the business practices are not clear. They are deceptive. And honestly, I feel that the whole company is kind of predatory." JA368:23-JA369:2.

Strosnider, who worked for AFS intermittently for fifteen years, testified similarly.[8] JA506-JA511. She stated: "I feel like sometimes the wording of the script itself was misleading. … I feel that's why sometimes customers would respond [to the script] and say, 'I want to cancel this free trial.' … Even with clarification, I'm not sure that everyone fully understood what the offer indeed was." JA509:22-JA510:7 (cleaned up). She further testified that telemarketers were required to "tiptoe[] around" the fact that they were selling "a subscription with the right of cancellation," and that she ultimately left the company because she felt she was misleading customers. JA507:17-22.

Stosnider and Luchette also confirmed that key terms were delivered only at the end of the call, after consumers were been led to believe no purchase was being made.[9] *See e.g.*, JA362:24-JA363:3 (describing the sales script as "written in a way to overload people with a lot of information as quickly as possible and to get people

---

[8] Ms. Strosnider was unable to appear at trial to testify. A transcript of her testimony was admitted into evidence, and the last seven pages of her deposition were read into the record at trial. JA86, at n. 11.

[9] The disclose paragraph of the sales script did indicate that a customer could cancel their subscription by writing "cancel" on an invoice that would be sent over a month after the initial phone call. JA22. However, viewed in conjunction with the rest of the script, and accounting for how telemarketers delivered the script (*i.e.* by deemphasizing the consumer's ability to cancel (ECF 432 at 50:1-7)), the disclosures were reasonably viewed by the FTC as insufficient to cure the misleading nature of the script. *See Beneficial Corp.*, 542 F.2d, at 617 ("the tendency of the advertising to deceive must be judged by viewing it as a whole.").

"off guard or not fully present in the conversation."); JA508:14-19 (describing the sales script as "very easy and laid back [with] no talk of cost or anything like that … until the last 45 seconds"). Stosnider specifically testified that the script did not provide customers "with all the information they needed." JA508:12-14. Instead, it "bombard[ed] people at the very end of the call." JA508:14-19.

Testimony of customer service representatives further confirmed consumer misunderstanding of AFS's offer. Melissa Schwenk testified that about half of all customers who called AFS complained that they had signed up for a free trial without an obligation to pay. JA502:21-JA503:23. Denise Haney testified that misunderstanding the offer as a free trial was the most common complaint her department received. JA665:10-22. And Jennifer Rann confirmed that during her time working in AFS's collections department, she would often hear from customers that they misunderstood AFS's offer to be a free sample rather than an order.[10] ECF 447, 23:17-24:25.

[10] The district court emphasized AFS's alleged good faith attempt to not mislead customers by discussing their "stringent" quality control efforts. *See* JA119. However, intent to deceive is irrelevant. *Beneficial Corp. v. FTC*, 542 F.2d 611, 617 (3d Cir. 1976) ("intent is not an element of a deceptive advertising charge"). Even well-intentioned business practices violate the FTCA if they have the capacity to mislead consumers. *Id*.

*ii. Testimony of Consumers who were Actually Deceived by the Sales Script Further Evidence the FTC's Reasonable Position.*

Proof of actual customer deception is not required for claims under Section 45(a) of the FTCA. *American Home*, 695 F.2d at 687; *Regina Corp. v. F.T.C.*, 322 F.2d 765, 768 (3d Cir. 1963) ("It is now settled that deception may be accomplished by innuendo rather than by outright false statements.") (citing *Bakers Securities Corp. v. F.T.C.*, 297 F.2d 403, 405 (3d Cir. 1961)). Although the FTC was not required to prove actual deception to establish liability, it nevertheless presented precisely that kind of evidence to support its claim. *Beneficial Corp.*, 542 F.2d at 617. Two customers testified at trial that they misunderstood AFS's offer in exactly the manner the FTC alleged.

Dr. Daniel Dewey holds a doctorate in chemistry and worked as a chemist for Mine Safety and Health Administration. JA395:8-22. He testified that, after speaking with an AFS telemarketer, he left the call under the impression he had not purchased anything. JA401:3-9. He explained that he agreed only to "a trial view of the content," from which he could later decide whether to subscribe. JA413:2-13 (explaining that his understanding was he could "elect to pay if [he] wished," not that he was "already enrolled.").[11] Moreover, he directly informed the telemarketer

[11] The district court was quick to brush aside Dr. Dewey's testimony on the ground that he was able to cancel his subscription without being sent to collections. JA112-JA113. However, the ease with which Dr. Dewey was able to cancel the (continued….)

during the call that he lacked purchasing authority on behalf of his employer, yet AFS ran a purchase order anyway. JA400:22-JA401:9. Even a highly educated professional came away from the call believing he had accepted nothing more than a preview.

Like Dr. Dewey, Ms. Rickard reinforced the same point. Ms. Rickard was a certified public accountant working as a tax manager when she received a call from an AFS telemarketer. JA372:6-21. She, too, left the call believing that she had not agreed to any paid subscription, as she did not have the authority to purchase on behalf of her company. JA388:11-JA389:4. When she later received invoices demanding payment of hundreds of dollars, she contacted AFS to dispute the charges. JA381:22-25. The situation escalated when, the very next day, she received a call from a debt collection agency threatening to report her to credit bureaus unless she paid immediately. JA381:22-JA382:9. Only after she threatened to file a complaint with the FTC did AFS cancel the purported subscription without requiring payment. JA383:24-JA384:6.

Both Dr. Dewey and Ms. Rickard testified as to the misleading nature of the phrase “no risk” in AFS’s sales script. Dr. Dewey testified that he finds the phrase

---

subscription is irrelevant to whether AFS’s script misled him into signing up for a subscription in the first place. The FTC did not challenge AFS’s cancellation procedures, it challenged how AFS secured subscriptions.

"no risk" "hard to divorce" from a free trial. JA418:10-17. Ms. Rickard testified that "no risk" meant that she "didn't sign up for anything." ECF 428, 87:8-10. While AFS insisted that the phrase no risk is readily understood by those in sales as separate from "free," consumers who lack that expertise clearly misunderstood it. JA328:25 (Colin Drummond, former head of telemarketing at AFS, testifying that "[n]o risk is industry terms").

All the FTC needed was a reasonable basis for asserting that the script itself misled consumers, and "evidence that some customers actually misunderstood the thrust of the message is significant support for the finding of a tendency to mislead." *Beneficial Corp. v. FTC*, 542 F.2d 611, 617 (3d Cir. 1976). Here, the FTC presented precisely that; evidence by way of firsthand consumer testimony that customers misunderstood what occurred during their phone calls.

*iii. Thousands of Consumer Complaints Submitted at Trial Confirmed that Consumers were Misled by the Script.*

The FTC submitted additional support for its assertion that consumers could be misled by AFS's scripts. The FTC admitted over three thousand consumer complaints submitted to the FTC, the Better Business Bureau, and the Pennsylvania Office of Attorney General. JA268-269. The consumer complaints read:

- "Please be advised that I did not place any order for this subscription. It was offered no charge. If there is a cost, please cancel the free offer and remove from your list." JA1956.

- "I did not place an order. I agreed to receive a few samples." JA1963.

- "I would like to clarify that I did not place an order, is that what no-risk means? … I have not agreed to anything except to review your materials[.]" JA1959.

- "I did not sign up for this. I thought I was being sent a free copy so that I could decide if our Club would be interested in signing up." JA1391.

These complaints reflect a consistent pattern among thousands of consumers, that they did not understand what they agreed to. Together with the testimony of AFS employees and customers,[12] the FTC had a reasonable basis in fact to assert that AFS's sales tactics had the capacity to mislead consumers.

### B. The FTC's Legal Position Aligned with Third Circuit Precedent.

Substantial justification requires a reasonable basis in both fact and law. *Morgan*, 142 F.3d at 684. Here, the FTC's legal position aligned with Third Circuit precedent in *Beneficial Corp*, 542 F.2d 611 and *American Home*, 695 F.2d 681, which are controlling cases for deceptive marketing claims in this Circuit.

---

[12] The FTC introduced additional evidence at trial, including testimony from a Senior Deputy Attorney General and Civil Investigator for the Pennsylvania Office of Attorney General and a Vice President of the Better Business Bureau who all discussed consumer complaints. *See* JA8-JA9. This Court has previously found that evidence, in conjunction with consumer testimony and consumer complaints, to be "overwhelming" support for a misleading marketing claim under the FTCA. *See F.T.C. v. Magazine Solutions, LLC*, 432 Fed.Appx. 155, 157, n. 1 (3d Cir. 2011) (unpublished) ("the testimony of program subscribers, who testified about their personal experiences,[] representatives of the Better Business Bureau and the Pennsylvania Attorney General's Office, who testified about consumer complaints[, and] hundreds of complaints from consumers who did not testify" was "overwhelming record evidence."). JA116.

In *Beneficial Corp.*, this Court addressed advertisements for an "instant tax refund loan" that, in reality, offered regular, short-term loans secured by anticipated tax returns. 542 F.2d at 623. The FTC argued that, while the term "instant tax refund loan" may be technically true, it obscured the true nature of the transaction offered. *Id*. at 617-18. Critically, the FTC's position was supported in part by testimony from consumers who misunderstood what was being offered. *Id*. at 618.

Upon review, this Court agreed that consumer testimony provided sufficient evidence to find the ad misleading. *Id*. at 618 (finding the FTC's view that the offer "had a tendency to deceive or mislead has a sufficient evidentiary support in the record as a whole."). Specifically, this Court wrote that "[t]he testimony of some consumers, credited by the Commission, was that [consumers] failed to understand [w]hat Beneficial was offering." *Id*. While those consumers may have been "singularly dense," they were nevertheless part of the intended audience for the advertisement which made their misunderstanding probative of the advertisement's tendency to mislead. *Id*. The FTC's approach in this case mirrors the framework approved in *Beneficial Corp.* It presented as witnesses at trial actual consumers who misunderstood AFS's offer. *See supra*–Section I(A)(ii).

In *American Home*, the FTC filed a complaint against an advertiser for "falsely" claiming its product "ha[d] a unique pain-killing formula … conclusively proven to be superior" to its competitors. 695 F.2d. at 683. While the advertiser

insisted all statements it made were true, this Court found that an advertisement may be misleading even if factually true, as "the failure to reveal material facts" can render an advertisement misleading under the FTCA. *Id*. at 683-84. Notably, it was immaterial that the FTC failed to produce evidence of actual deception. *Id*. at 687 (holding that the FTC need not "buttress its findings that an advertisement has the inherent capacity to deceive with evidence of actual deception.").

Again, the FTC's theory here fits squarely within *American Home's* teachings. The FTC argued that AFS's scripts, taken as a whole, conveyed a materially incomplete and misleading picture of the transaction. *See supra*-Section I(A). That is precisely the type of misleading practice *American Home* contemplated. 656 F.2d 681. Even if certain statements in the script could be parsed as technically accurate, the failure to communicate the existence of a binding financial obligation is a material omission that rendered the overall message deceptive. *Id*. at 684, 87. And again, while under *American Home* the FTC did not need evidence of actual deception, it presented exactly that at trial in this case. *See supra*–Section I(A)(ii).

The district court mistakenly concluded that the FTC "abandoned" the teachings of *Beneficial Corp.* and *American Home* by focusing too narrowly on the phrase "no risk" rather than viewing the script as a whole. JA126-JA127. That characterization misinterprets the FTC's argument. The FTC certainly highlighted the phrase "no risk" as one way in which the scripts had the capacity to mislead

consumers. *See, e.g.*, JA245. However, the FTC's case did not hinge on the single phrase; it rested on the cumulative effect of the scripts' language, structure, and delivery. In sum, the FTC did precisely what this Court's precedent encourages in terms of proving a deceptive marketing claim under the FTCA. So even if the district court disagreed with the FTC's position, its position was nonetheless reasonable.

## II. THE DISTRICT COURT CONFLATED ITS MERITS DETERMINATION WITH THE EAJA'S SUBSTANTIAL JUSTIFICATION INQUIRY.

There is a critical distinction between disagreeing with the government's position and the government's position being unreasonable; the latter situation warrants the imposition of attorney's fees under the EAJA while the former does not. *See Pierce*, 487 U.S. at 565; 28 U.S.C.A. § 2412(d)(1)(A). Recognizing this distinction, this Court has made clear that "the inquiry into reasonableness for EAJA purposes may not be collapsed into [the] antecedent evaluation of the merits, for the EAJA sets a distinct legal standard." *Morgan*, 142 F.3d at 685 (quoting *Cooper v. United States Railroad Retirement Bd.*, 24 F.3d 1414, 1416 (D.C. Cir. 1994)). *See also Kiareldeen v. Ashcroft*, 273 F.3d 542, 554 (3d Cir. 2001) ("Whether the government was substantially justified … does not present the same question as that presented by the underlying merits of the case."). But that is precisely what the district court did here.

The district court determined that the FTC did not support its position with "adequate" witness testimony or other "relevant" evidence. JA121. As discussed,

*supra*-Section I, that determination is belied by the record. The FTC's evidence, even if ultimately unpersuasive to the district court sitting as factfinder on the merits, suffices to establish that the FTC's position was "justified to a degree that could satisfy a reasonable person." *Brinegar*, 741 F.2d at 589. After all, the same exact type of evidence was sufficient in other cases for deceptive marketing claims. *American Home*, 695 F.2d 681; *Beneficial Corp.*, 542 F.2d 611; *Magazine Solutions, LLC*, 432 Fed.Appx. 155 (unpublished).

Even if the evidence presented at trial substantially favored AFS—as the district court insists—that does not resolve the substantial justification inquiry. *See, e.g., Hadden v. Bowen*, 851 F.2d 1266, 1269 (10th Cir. 1988) ("a lack of substantial evidence on the merits does not necessarily mean that the government's position was not substantially justified."); *Cohen v. Bowen*, 837 F.2d 582, 585-86 (2d Cir. 1988); *Taylor v. Heckler*, 835 F.2d 1037, 1044 (3d Cir. 1987) ("Congress has left the door open to the possibility" that the government who does not present substantial evidence "was nonetheless substantially justified."); *Pierce*, 487 U.S. at 565 (substantial evidence "does not mean a large or considerable amount of evidence."). By equating what it viewed as a lack of "adequate" evidence on the merits (JA121) with a complete absence of justification, the district court applied the wrong standard. And that error requires vacatur of the district court's order awarding costs and attorney's fees.

## CONCLUSION

For these reasons, this Court should vacate the district court's July 30, 2025, order awarding attorneys' fees, expenses, and costs.

Respectfully submitted,

DAVID W. SUNDAY, JR.
Attorney General

By: */s/ Kiley M. Verbanac*

Kiley M. Verbanac
Deputy Attorney General
Bar No. 336304 (Pa.)

DANIEL B. MULLEN
Chief Deputy Attorney General
Chief, Appellate Litigation Section

Office of Attorney General
1251 Waterfront Place
Mezzanine Level
Pittsburgh, PA 15222
Phone: (412) 841-5713
FAX: (717) 772-4526

DATE: May 13, 2026

## CERTIFICATE OF COUNSEL

I, Kiley M. Verbanac, Deputy Attorney General, hereby certify as follows:

1. That I am a member of the bar of this Court.

2. That the text of the electronic version of this brief is identical to the text of the paper copies.

3. That a virus detection program was run on the file and no virus was detected.

4. That this brief contains 5,744 words within the meaning of Fed. R. App. Proc. 32(a)(7)(B). In making this certificate, I have relied on the word count of the word-processing system used to prepare the brief.

*/s/ Kiley M. Verbanac*

Kiley M. Verbanac
Deputy Attorney General

## CERTIFICATE OF SERVICE

I, Kiley M. Verbanac, Deputy Attorney General, do hereby certify that I have this day served the foregoing Brief for Appellee Commonwealth of Pennsylvania, via electronic service, on all parties of record.

Seven copies were also sent by first class mail to the Clerk of the United States Court of Appeals for the Third Circuit in Philadelphia, Pennsylvania.

*/s/ Kiley M. Verbanac*

Kiley M. Verbanac
Deputy Attorney General

DATE: May 13, 2026